Corrections Corporation Mr. Hendrickson. Good morning, Your Honors. May it please the Court, Your Honors, the most glaring error of the trial court in taking away the jury's verdict in this case, aside from the numerous instances where the Court substituted its view of the facts and the inferences that could be drawn there from on a myriad of facts, has to do with the finding about the prompt and remedial investigation that took place, and that is a finding on page 21 of the district court's ruling on the motion for judgment. Now, in that instance, the Court viewed the evidence certainly differently from the jury and in a light most favorable to the defendant in the case by saying, even though the policies and procedures required prompt and remedial investigation, a reporting back under Exhibit 3 in the case, which is Docket 110-3, a report back to the employee who reports harassment, which never took place until two months after the actual notice by Corrections Corporation of the sex harassment in the workplace, that there was a prompt and remedial investigation by the warden beginning July 10th. So we go through, and putting aside constructive knowledge, actual knowledge, July 10th, Ms. Wilcox gives written notification of having been touched by her sergeant in this prison setting. July 20th. Dealing with one episode. That's correct. One episode of being touched. I understand. There's notice given and there's absolutely no evidence of a prompt investigation of that or a report back as required by the sex harassment policy. Is there anything in the record that says that Jackson continued to sexually harass Wilcox after the report was made on July 10? There is, Your Honor. Sexual harassment. That's right. The intimidation and threatening behavior, the punching of the machine which took place, the threatening looks at her. And so we would contend that is a part and Harris v. Forklift, Supreme Court's admonition to the courts. You look at the entirety, the totality of the circumstance and the context here. We have evidence in the record of going back to the huggings that took place, the touching. None of that was complained of. The touching was complained of? One episode, it was complained of. That was in the complaint that went to the warden on July 10th. Right. And then July 20th. And he took prompt action. There's no evidence he took prompt action. In fact, he violated the... He got HR involved. No. In fact, Ms. Wilcox got HR involved. So the evidence is she goes to HR, they tell her to write it up. And it went to the warden, yeah. And it went to the warden and nothing happened. And per the policy, it's supposed to go back. Was there a report back to Ms. Wilcox that there was harassment? Suppose punching the machine and the stare never occurred. So what do you have? Well, then July 20th, she goes back to Pooler, who's the head of human resources. What do you have if nothing at all in terms of harassment happened after the 10th of July? Make that an assumption. I'm not arguing with you. I'm just asking a question. So after... What's the legal effect of nothing occurring after the 10th of July? If nothing occurred and she didn't work with him, that would be no additional harassment. What's the legal consequence of it? So the legal consequence of nothing occurring? Yeah. Assume that nothing occurred after the 10th of July. That there would be, in terms of going forward, no longer a harassing environment. And the policy presumably... She had got a cause of action against the warden for negligent investigation or whatever you want to call it, if nothing happened. That's right. On this point. This is related to the actual notice. With regard to this sergeant. That's right. But with regard to actual notice, there would be, if it stopped there, then the policy would have worked. But it didn't stop there. Then the district court's ruling would be correct. Not that there was an immediate... If nothing happened after the 10th of July, the defendant's entitled to judgment. Is that not the case? Right. If that was the scenario, but that's not the situation. I understand that. If nothing happened between her and the sergeant after the 10th of July, there's no case. That's correct, Your Honor. Okay. In terms of... Just a minute. So you have to tell us what happened after the July, which created a case of sexual harassment. On actual notice. Because Your Honor... No, just pervasive sexual harassment under the definition the law gives. Okay. Well, then when Your Honor says, if nothing happened, there's no case... No, I didn't say that. I said, assume it did, you don't have a case. That's correct. So you have to tell us what happened afterward. Just a minute. Sure. What happened afterwards, which creates a case? She was left in an intimidating and threatening work environment with Jackson. And she comes back July 20th, explains that he is being threatening to her in the workplace, the pooler. She puts it in writing July 23rd. It goes to the warden. Then it doesn't get investigated until the end of August, when the jury could credit her testimony that she spoke directly to the warden. What you're saying is what she said on July 23 constitutes sexual harassment under the law. That... What she described as sexual harassment under the law. That's correct. Okay. That's correct. And that the environment remained threatening, and that was put in writing in that July 23rd writing, as well as the verbal complaints on July 20th. And this is all regarding... So let's assume the complaints. You're talking about what she's complaining about. Correct. And your argument is what she complained about constitutes, as if in the first instance, a case of sexual harassment. Correct. Okay. Correct. And then the Golden Report, which is the report that leads to the termination in September of 2014, goes through... Excuse me, 2009, goes through a litany of harassment that that workplace was permeated with. That's not your client's case. They fired the man. Right. They fired the man after... I understand. Right. I understand that, after they ran an investigation, but it had nothing to do with your client. It had plenty to do with my client in that... It had to do with a widespread investigation. It had to do with, primarily, my client's reports that began in August when nothing was happening. Your argument is your client triggered the report that caused the widespread investigation and is firing. Right. And that the report itself focused primarily on Ms. Wilcox's complaints of harassment in the workplace, where Ms. Golden, in Exhibit 110-10, talks about the acts directed at Ms. Wilcox in page 1 of the Exhibit 10, and going through the harassing and retaliatory and intimidating atmosphere that existed. So, she had two months working with Jackson. There's testimony of record that she was in a threatening and intimidating environment, perpetrated by Jackson after July 10th, and there was not a prompt, appropriate investigation. Had there been, there would have been, per their own guidelines, a report back to Ms. Wilcox, which there wasn't until... I'm having a hard time, counsel. Sure. Whether you're complaining your case is because they did an inappropriate investigation, or that your complaint is that the conduct constituted sexual harassment. The conduct... Excuse me. After the 10th of July. The conduct constituted sex harassment after the 10th of July, the threatening conduct, and before. And I'm saying that the district court, when it ruled that there was, as a matter of law, an appropriate and prompt investigation after the July 10th report, is incorrect. And substituted... And your argument is it didn't take appropriate action to deal with the man. They left him with her and allowed him to perpetrate additional threatening and intimidating acts. So you're judging the response that she makes to the report on July 10th, and then she's saying that the 49 days that passes before the outside investigator, Golden, comes in, that that's too long. Because ultimately, this man was investigated and fired. So there was a process instituted. But your client is complaining about the time period before an outside investigator was called in, and your client is complaining about that she was not kept up to date on the process. Is that, in essence, sort of the two pieces of the problem with the investigation? Respectfully not. It was keeping her with Jackson, overseeing her from July 10th until September 14th, when he was terminated. And in that time period, there's record evidence that the jury credited that said they was in a threatening and intimidating work environment, perpetrated by Jackson, in addition to the other acts of sex harassment. Forget the other acts, counsel. They've got nothing to do with this case. You shouldn't have to borrow on other acts that had nothing to do with your client. Other acts perpetrated against Ms. Wilcox. We're talking about that period of time. Right. So that is – so the investigation that happened after nothing happened and she was left with him, we're saying it's July 10th through September 14th. And the district court concluded as a matter of law that Jackson was not her supervisor. So when you keep saying he was in charge of her, that would go against what the district court had ruled. Only as to Farragher and Ellis' supervisory capacity, the district court recognized that as a sergeant he had responsibilities to direct her behavior in the workplace and control her. He outranks her. That's right. He wasn't supervising her day-to-day operations. He didn't have the authority, the court said, to terminate, to lower her pay, but he did direct her in the workplace. You've saved some rebuttal time. Thank you, Your Honor. Mr. Koenig. May it please the Court. Good morning, Your Honors. There are two fundamental differences in the case as it is today versus 2015 when it was up on appeal prior. First, as Your Honor just noted, it's established that Jackson was a co-worker. He was not a supervisor. So there's no strict liability here. In a co-worker case, CCA can only be liable for harassment where the plaintiff demonstrates that we had actual or constructive notice and failed to take prompt remedial action. So the burden is on the plaintiff. Second, as Your Honors pointed out, the plaintiff never complained to CCA about these hugs that were talked about in the first opinion. They weren't briefed. We're focusing on what happened after the 10th of July. Correct. I appreciate that. That gets to the heart of it. So it seems to me like the best argument that opposing counsel has is that it's not from the period from July 10th to July 23rd because at that point the record seems pretty clear. Sammons was interviewed. There was some type of an investigation conducted and Jackson was told to stay away from Ms. Wilcox and not to interact with her. But then on the 23rd, she files another complaint and she says, He's intimidating me. He's told me that he can touch me if he wants to and he's hitting machines in front of me and he's making intimidating facial gestures towards me or eyes, however she phrased it. And then she has to continue to work with him until he's fired a month and a half later. And the investigation of that does not begin until August the 27th. So that's a little over a month, I guess. And so that is the period during which I think opposing counsel is making his argument for this idea that there wasn't prompt remedial action. I don't know if you want to address that. I'd be happy to. Several points on that, Your Honor. Plaintiff attempts to sort of hitch her wagon to a bunch of other complaints. Forget that, counsel. Answer the question. But that's the plaintiff's case here. Can you answer the question that Judge Rosenbaum put to you? What did she ask you? She asked me what happened between the 10th and the 12th. What happened after that? Really, it's the 23rd of July and the 27th of August when the investigation begins. And I'll go back to the 10th because plaintiff's testimony was crystal clear at trial. She said from the 10th of July of 2009 until Jackson was fired, Jackson never touched her. Jackson never said a word to her from that date forward. She said not a sexually harassing word. No, she said he never said a word to her. That was her testimony at deposition, cross-examined her at trial. All right. But even so, he's punching machines around her. He's making faces at her. He's engaging in arguably physically intimidating behavior. Mendoza, the en banc opinion of this court, says that looking— Counsel, ignore the legal consequences of whether punching is sexual harassment. Can you do that? Yes. What are the facts of his conduct after the 23rd of July to that August date? It could have been punching the machine, whatever it was. What does the record have as to what he supposedly did in her presence or she could see it somehow? That was it. Her testimony was he rolled his eyes at her. When did he roll the eyes? That was in that interim period. I understand. Does the record tell us where they were? I believe they were somewhere in the facility where other people were around. We don't know exactly where or under what circumstances. I don't recall, Your Honor. But she was never alone with him again during that interim period. There were always other people around. She indicated that he punched a machine. He rolled his eyes at her and looked at her. That was the totality of the information. But again, he never touched her, never said a word to her after the first complaint. So our argument is plaintiff is arguing a process. Your argument is that doesn't constitute sexual harassment. Correct. Let me ask you, why did it take so long? I mean, you know, 35 days does seem like an awfully long time from the time she complains about this kind of behavior until the time an investigation is undertaken. Our argument is that's an improper time frame.  That's what I'm asking. And I'd be happy to talk about that. July 10th of 2009, she complains that he was brushing paint. She complained that he slapped me on my butt twice. The HR reported it immediately to the warden that day. He immediately began looking at me. And I agree. I'm past the July 10th thing. I don't have a problem with the investigation that was taken from July 10th. So July 23rd, though, we have new allegations. There were no new allegations on the 23rd. There are new allegations. The new allegations are that he's punching the machine in front of her, he's rolling his eyes, and she's feeling intimidated. That didn't come up until trial, that information. So that's why it's important to look at what the company knew. Because again, it's a notice obligation, right? What was the July 23rd communication? The July 23rd communication, she sat down with the HR manager, and the HR manager told her to write out everything that had happened to you. And the only physical touching she talked about in that July 23rd document was the slap me twice on my butt again. That's the one that gave rise to the July 10th? Correct. And it wasn't until August 27th. Well, actually, didn't she also say the July 10th incident was not the first time Jackson had touched her? He said he could touch her whenever he wanted to. And that Jackson told her, that Chief Jake Spires told him that he did not have to worry about the complaint. Wasn't that also in the July 23rd complaint? Yes. So my question is, why did it take so long? Why did it take over a month to investigate that, to begin investigating that? And you were going to tell me what happened. So what happened was, because they investigated the July 10th, and then there was some new, and remember, I know we don't want to get into all the other complaints that she made about all the other things. Forget that, counsel. We're talking about what was said on the 23rd of July. I'm trying to get there, Your Honor, because there were so many complaints that had nothing to do with this case. Counsel, I understand that. That's why it took so long, because there was so much at issue. What was said on the 23rd of July? Your Honor just read the report. She referenced the butt-slapping incident again, and she said that he could touch her anytime he wanted. All right. How about the punching and the looks? That wasn't in the 23rd report. That was not? No. All right. And the 23rd report was about behavior that had occurred prior to July 10th, correct? Correct. And on July 10th. But there were all sorts of other things, so that's why they decided to... That was involved with other people, and that... So what investigative steps were triggered as a result of the visit with HR on the 23rd? That's what triggered the outside investigator coming in. Okay. How much time between then and the outside investigator, and who generated that? The warden generated that. He called corporate to ask for... because there was a lot more than what he thought he could handle, so he called corporate, and they got somebody from Kenya Golden from another facility to come in and interview employees, and it was the 23rd of July till the 27th of August. It took her that time to arrange everybody to get interviewed. And all the interviews were finished by the 27th? I believe it was all one day, Your Honor. Actually, I don't think it was one day, was it? I mean, the report wasn't generated until September the 9th. But, I mean, I don't really have an issue with that. I think that, considering what she did, that that's reasonable. Yeah, she generated the report on the 9th, and they terminated him on the 14th. But there is some evidence in the record that in mid-August, Ms. Wilcox went to the warden and said, you know, what are you doing about my complaint? And he said, get back to work or whatever, and did not say, I've referred it for an investigation, did not tell her anything, which could lead to a reasonable inference that he didn't think he was going to have to do anything, and then she said, well, if you don't do anything, I'm going to take it outside the facility, at which point, then in mid-August, he contacted CCA headquarters and arranged for this. I mean, that's basically the inference that's being... Yeah, but there's no evidence of that. I mean... But that's a reasonable inference that could be drawn, is it not? And if it is, then again, the question is, was CCA really enforcing its policy? They were, and again, the evidence, the only evidence at trial was the warden's testimony that he called corporate promptly to engage the outside investigator. There was no record evidence, I mean, other than the fact that I think she interviewed, had to arrange to interview 16 or 17 people, and she was traveling from another location to get here, so it took about a month to do that. But beyond that, there's no evidence that... In fact, the investigator herself looked at that issue and concluded that there was no delay by the warden in how he handled the response to the complaints. So, the only record evidence is that we acted promptly and remedially, and frankly, the case law backs us up on that, because again, he never touched her, never talked to her during that interim period, so ultimately, they terminated the one individual that she complained sexually harassed her within five days after getting the report, saying that there was these new things that came up when she talked to the outside investigator. That's the first we'd heard about these new incidents touching on her thigh, and this comment about the military friend was on the 27th of August. I agree. There was nothing before that. Right. And so, under the case law, you know, while, you know, plaintiff can pick apart little parts of the process, maybe it could have gone a little quicker, maybe it could have... The case law is very clear that, in essence, the ends justify the means. He ordered him to stay away from her, never talked to her again, never touched her, and then, at the end, they terminated him very quickly once they got the formal report from Golden, saying... Let's say that, I know this isn't the facts, but I'm not sure the ends can justify the means if, for example, she had complained on July 23rd and then on June 20th of the next year, they finally decided to take an investigation and she's having to work with him that entire time. That's not what you're arguing, is it? No, what we're arguing, Your Honor, is that the investigation was reasonable under the circumstances and the circumstances were... And you have to sort of piece... I know we don't want to parcel each out, but that's how you have to do it because that's how they were living it at the time. July 10th, she said, he slapped me on my butt twice. They jumped on that immediately. They got statements. The warden determined that their, you know, the testimony was somebody was... He was brushing paint off the back of her jacket and so he concluded in the context of what was going on that it did not amount to sexual harassment. And then you look at the next one and she said, the other things that Your Honor has read from the report and he said, okay, and again, it wasn't just harassment in that report. There's, you know, all sorts of things she complained about. Somebody called her kid and somebody threw a basket at her. And we're not focusing on any of that. I know, but the context was the warden was dealing with that and he had to act reasonably under the circumstances and that was a reasonable step. The interim step of looking at this, brushing off the jacket, he determined that wasn't, that was all they knew and that wasn't harassment. And then the next episode was the 23rd letter and he engaged the outside investigator. So, at each step of the process, they acted reasonably under the circumstances. You're saying there was a whole lot to unpack in the 23rd letter in addition to the sexual harassment stuff and that is what gave the warden a little bit of extra leeway in the amount of time it took to set up the investigation. There was a whole lot to unpack and ultimately, you know, CCA terminated the plaintiff for making unwarranted complaints and that, so there was a slew of all these complaints. When did they tell him to stay away from her basically? July 10th was the testimony that immediately upon getting that... This came from the warden? The warden. Warden to the sergeant, stay away from her. Correct. And the testimony was he never touched her and never talked to her again so we believe that was an effective order by the warden. And under the case law as I indicated, you know, the fact that he may have rolled his eyes at her, that's not harassment. From a... Do we have in the record layouts of the correctional institution showing where she worked and where he moved around and all those sorts of things? There's not a... I don't believe there's a diagram. All we have is verbal descriptions. Correct. But he didn't have any authority over her area so he didn't... How confined was her area? She worked in the commissary so it was fairly confined. It's where they go to... Yeah, that's where they... What little money they have they can buy things. Right. So she... It was... She was not moving about the institution. No and she was not required on a day-to-day basis to work with him so that even before even before these complaints. What was his duty assignment? They called him a hallway sergeant I think. What does that mean? He just had general duties over the population. To do what? Your Honor,  there was no job description and his testimony was that he just made sure that inmates were moved to the right places, that they were doing the things that they were supposed to be doing correctly. Okay. What was the population of the institution? I think it was around 1,300 inmates, federal. What was it designed for? Designed for, Your Honor? Yeah, they're all designed for a certain capacity. I don't know that. We don't know. No. Thank you, Your Honors. Briefly, Your Honor, Document 110, Exhibit 9, which is the July 23rd memo from Ms. Wilcox, page 2. She documents July 20th where she speaks with Pooler, the head of HR. Chief Spire says, I requested this update. Sergeant Jackson continues to be on my post and I am afraid he will touch me again since this is not the first time that he has touched me. And I've previously told, so it's not just July 20th. That's when she puts it in writing. She has talked to the head of Human Resources. The head of Human Resources, Ms. Pooler, testifies at entry on the record 124 at page 235 of the trial transcript that she acknowledges on July 20th, a number of days after July 10th, Ms. Wilcox comes to her crying saying, I'm still being affected by what's going on. Record at 123 pages 71 through 72, she describes the harassing, intimidating, threatening, not specific sexual comments, but sexual harassment under Harris and his progeny because when you look at the totality when he's punching his fist in his hand, which he testifies about. When's the first time that she testified, or that she gives any indication of that? That he's been being, uh, the specifics specifically in deposition about him intimidating her. So after, after, after the investigation has been done, after Jackson's been fired, this is the first time we hear about the punching the machine, etc. The punching the machine. Is that right? Yes. Saying specific, saying she's being intimidated by him on July 20th, uh, during the investigation. Where, where, where was the  with regard to the commissary? In the commissary. It is a confined area and he would, as sergeant, that was part of his duties to oversee her work there. She worked with an assistant. He over, he was her overseer in the commissary? That, that, she was the head of the commissary. Yeah, correction. What's the evidence that he was her superior? Uh, his testimony and her testimony. That he supervised her work? Correct. Okay. Correct. Right. He didn't have the duty to fire her or, or. What could he, what was the nature of the supervision of her work? He would, uh, tell her what to do if she was performing improperly and he would write her up. She's, she, she's, uh, selling goods out of the commissary and he is supervising that, those sales? He's supervising her supervising the assistant doing that. Supervising her handling of those sales? That's correct. Okay. Overall, yes. To be clear though, you're not arguing that, um, you're not arguing that there is direct liability here. I'm sorry, that there is vicarious liability here. You're arguing, in other words, you're not arguing that, um, that he's the type of supervisor that then triggers vicarious liability. We're not. We're not. Right. We're saying. So the only relevance to this idea that he's her supervisor goes to any kind of power he might have had in the context of whether it was a sexually pervasive and hostile work environment. Correct. And that's when she reports on July 20th. What power did he have over her? He could direct her in what to do. Oh, he could tell her what to do? Yes. In the workplace. He just couldn't fire her. He couldn't reduce her pay. I see. And you find that in the trial transcript before the jury that he had the power to direct her activity. Yes. Okay. Yes. And July 20th she reports the intimidation. It's documented July 23rd. Nothing's done until the termination on September 14th. Thank you, Your Honor. Red light's on and we have your case and we will be stand adjourned under the usual